******************************************************

The ''officially released'' date that appears near the beginning of each opinion is the date the opinion will be published in the Connecticut Law Journal or the date it was released as a slip opinion. The operative date for the beginning of all time periods for filing postopinion motions and petitions for certification is the ''officially released'' date appearing in the opinion.

All opinions are subject to modification and technical correction prior to official publication in the Connecticut Reports and Connecticut Appellate Reports. In the event of discrepancies between the advance release version of an opinion and the latest version appearing in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports, the latest version is to be considered authoritative.

The syllabus and procedural history accompanying the opinion as it appears in the Connecticut Law Journal and bound volumes of official reports are copyrighted by the Secretary of the State, State of Connecticut, and may not be reproduced and distributed without the express written permission of the Commission on Official Legal Publications, Judicial Branch, State of Connecticut.

******************************************************

KAREN ZILKHA *v.* DAVID ZILKHA
(AC 39714)

Alvord, Prescott and Eveleigh, Js.

*Syllabus*

The defendant, whose marriage to the plaintiff previously had been dis-
solved, appealed to this court from the judgment of the trial court
denying his motion for modification of custody and visitation and his
motion for order. The parties' separation agreement, which had been
incorporated into the dissolution judgment, provided, inter alia, that the
parties would share joint physical custody of their two minor children,
even though access by the defendant to the children was by therapeutic
parenting time only, and that the children would reside with the plaintiff.
Following the dissolution of the parties' marriage, the trial court ren-
dered judgment on a stipulated agreement between the parties concern-
ing efforts to reunify the defendant with his children, including the
retention of certain therapists for the children. Thereafter, the defendant
filed a motion seeking to open the dissolution judgment to modify the
custody and visitation orders in effect and a motion for order, which
both sought, inter alia, to enforce the stipulated agreement regarding
reunification and to continue the reconciliation in order to reunite the
defendant with the children. The trial court denied both of the defen-
dant's motions and ordered that, inter alia, he would not have any legal
right to direct access to the children, and that the extent of such contact,
if any, would be determined solely by the children. *Held*:

1. The defendant could not prevail on his claim that the trial court abandoned
its obligation to decide the matter before it and improperly delegated
its statutory authority regarding custody and visitation by granting the
children a considerable level of control over the extent of the defendant's
access to them: that court, rather than delegating its responsibility,
properly exercised its decision-making authority and met its obligation
to decide issues of custody and visitation by denying the defendant's
motions, as the court did not ask any other person to decide whether
the defendant should have any right to custody or visitation, fully
weighed the facts presented and the competing interests of all the par-
ties, set forth the proper legal framework, and rendered a decision on
the merits, which articulated in detail the basis for its decision denying
the defendant's motions; moreover, the defendant failed to show that
the court abused its discretion by failing to consider the best interests
of the children or any established public policy, and the fact that the
court's order left open the possibility of voluntary visits at the discretion
of the children did not transform the court's decision-making into imper-
missible delegation.

2. This court found unavailing the defendant's claim that the trial court
improperly relied on events that occurred between 2004 and 2007 in
reaching its decision to deny his motions, and disregarded what he
described as an indication to the parties during the evidentiary hearing
that such evidence was too remote and insufficiently weighty for proper
consideration by the court; the trial court properly exercised its discre-
tion by weighing all the facts and circumstances of the family situation,
and it did not indicate during the proceedings that it would not consider
or rely on evidence occurring before 2007, or that it otherwise precluded
or limited the scope of the parties' presentation of evidence, as the
court encouraged the parties to focus on the most relevant facts relating
to the then current feelings and their conduct, and it was not improper
or surprising that such guidance from the court was necessary and
appropriate to maintain an orderly and timely presentation of the
evidence.

3. The defendant could not prevail on his claim that the trial court improperly
considered and adopted the recommendations made by the children's
guardian ad litem because she chose to function as an attorney for the
minor children instead of fulfilling her obligations as a guardian ad litem:
the record did not support the defendant's claim that the guardian ad
litem blindly advocated for the children rather than exercised her own

discretion in making her recommendations to the court, and although the court indicated that the guardian ad litem's recommendation assisted it in its own independent calculus of what relief would be in the best interests of the children, the court never indicated that it was simply adopting the recommendations of the guardian ad litem, and it also carefully considered and discussed in its decision other contrasting viewpoints; furthermore, the guardian ad litem's testimony and opinion were subject to cross-examination by the defendant's counsel, who was free to explore the defendant's allegations of bias and failure to adhere to her obligations as guardian ad litem.

4. The defendant's claim that the trial court, in reaching its decision, improperly relied on an erroneous factual finding that the parties' reconciliation therapist had ended reconciliation therapy with the parties was unavailing: whether the therapy was in fact ended by the professionals or whether the parties simply stopped attending on their own, there was nothing in the court's analysis that suggested that that was an important or material factor in its decision to deny the defendant's motions, as it was the failure of the therapy to alter the destructive behaviors of the parties that led the court to its conclusion that continuing therapy was unlikely to be in the best interests of the children, and, thus, even if the court's finding that the reconciliation therapist ended reunification therapy was a factual error, when the court's remaining unchallenged findings were considered as a whole rather than focusing on that one alleged inaccuracy, there was ample support in the record for the relief ordered by the court.

Argued November 30, 2017—officially released March 13, 2018

*Procedural History*

Action for the dissolution of a marriage, and for other relief, brought to the Superior Court in the judicial district of Stamford and tried to the court, *Abery-Wetstone, J.*; judgment dissolving the marriage and granting certain other relief; thereafter, the court, *Emons, J.*, rendered judgment on a stipulated agreement between the parties concerning efforts to reunify the defendant with his minor children; subsequently, the matter was transferred to the judicial district of Waterbury; thereafter, the court, *Hon. Barbara M. Quinn*, judge trial referee, denied the defendant's motion for modification of custody and motion for order; subsequently, the court, *Hon. Barbara M. Quinn*, judge trial referee, denied the defendant's motion to reargue, and the defendant appealed to this court. *Affirmed.*

*Nicholas J. Adamucci*, with whom, on the brief, was *George Kent Guarino*, for the appellant (defendant).

*D. Suzanne Snearly*, guardian ad litem for the minor children.

*Opinion*

PRESCOTT, J. In this highly protracted and bitterly contested family matter, the defendant, David Zilkha, whose marriage to the plaintiff, Karen Kaiser,[1] was dissolved in 2005, appeals following the denial of postdissolution motions that sought to modify existing orders governing custody and visitation rights of the defendant with respect to the parties' children, who are now teenagers. The defendant claims on appeal that the court improperly (1) delegated its judicial function and failed to consider both the best interests of the children and public policy by granting the children considerable control over the defendant's level of access to them; (2) relied on events that occurred between 2004 and 2007, despite having informed the parties that such evidence was too remote and insufficiently weighty for consideration; (3) adopted the recommendation of the children's guardian ad litem, despite the guardian ad litem's alleged abandonment of that role; and (4) relied on an erroneous factual finding that reconciliation therapy had concluded, purportedly in direct contradiction to testimony provided by the parties' reconciliation therapist. Additionally, the defendant requests by way of relief that, if this court agrees with all or parts of his claims, we should exercise our inherent equitable authority and order, without a remand, that the children participate in one of the reunification programs identified in his proposed orders to the trial court. For the reasons that follow, we reject the defendant's claims and affirm the judgment of the trial court.

The following procedural history and facts, as set forth by the trial court, *Hon. Barbara M. Quinn*, judge trial referee, in its detailed, thoughtful and well reasoned memorandum of decision are relevant to our discussion of the defendant's claims. The parties married in 1998, and their twin children, Chloe and Jake, were born a few years later in February, 2001. The parties "never were able to form the mutually supportive and understanding relationship that a successful marriage would require. . . . By 2004, their relationship became untenable . . . .

"[Despite the plaintiff having commenced divorce proceedings in late 2003, the parties] remained in the [marital] home in Connecticut together, and the escalating tensions were difficult for both of them to endure. [The defendant] worked in New York for a hedge fund, which ultimately collapsed. The time constraints of his position did not permit him to be home with his young children during the evenings before they were put to bed. [The plaintiff] assumed the traditional mothering role to the considerable exclusion of [the defendant], whom she viewed as unfit to parent. . . . [The defendant] found the proposed loss of the daily society of his children extremely painful, and so resisted moving out of the home."

On three separate occasions during the summer and fall of 2004, the police were called concerning conflicts between the defendant and the plaintiff. The second and most significant of the three incidents "came during a verbal argument between these [parties] on June 30, 2004, which the children witnessed. [The defendant] lost control and struck [the plaintiff] that evening. He struck her in the face several times, and the police observed [the plaintiff] to have a black eye, ultimately medically determined to be a fractured eye orbit and bridge of her nose. [The defendant] denied hitting [the plaintiff], and blamed it on the children. . . .

"[The defendant] was ultimately criminally charged . . . and vacated the family residence. His children were then three and one-half years old. He has not resided with them or had them in his care without supervision during the day or overnight since that time . . . ."[2] (Footnotes omitted.)

"[The defendant's] employment situation was also fraught with difficulties, and the hedge fund where he was employed collapsed during this time. A Securities and Exchange Commission (SEC) investigation into the collapse of the fund and the conduct of its principals, including [the defendant], resulted in negative publicity. Among other factors, this negative publicity resulted in [the defendant's] continued unemployment in the ensuing years and to the present time. All these matters added . . . stress and tension [to] the end of his marital relationship [and contributed to] his inability to enjoy free and uninhibited access to his two children."

The plaintiff and the defendant were psychologically evaluated by Harry Adamakos, a psychologist, from October, 2004, through March, 2005. The evaluation was ordered, at least in part, because the plaintiff, at that time, was seeking sole custody of the children. Adamakos prepared a report summarizing his findings as to each party.[3] At the time of the evaluation, the parties agreed that, prior to the escalation of conflict in 2004, the children enjoyed a very positive relationship with the defendant. Adamakos noted that, although the defendant lacked experience, he probably could learn to care for the children responsibly, at first for short periods of time but eventually for a day or two at a time. Adamakos also believed that the defendant's ability to parent the children "would likely improve as they become older and move out of the tender years, supporting a plan that would further increase father-child time as they get older." Despite this evaluation, "a normal divorced parent relationship with their father was not permitted to evolve. The psychological features of each parent noted in [Adamakos'] evaluation combined into the 'perfect storm' of mutually negatively reinforcing interactions and destructive synergy to prevent a normal visiting relationship from developing in the many years that have passed since that time.

"[The plaintiff's] anxiety and need for control over all aspects of visitation have called into play the worst of [the defendant's] needs for denial and excessive repressive defense mechanisms, all to the detriment of their two children. The plaintiff does not accept or believe that it is best and healthy for her children to have access to [the defendant]. Her rejection of this central and important tenet of child-rearing and her beliefs about [the defendant] have led her to completely frustrate the normalization of [the defendant's] access to his children. [The defendant's] own angry conduct and at times inappropriate, childishly self-focused dealings with his children have played into her fears and anxieties, and only strengthened her beliefs in this regard."

The court also found that the following contributed to the parties' inability to implement a normal visiting relationship between the defendant and his children. First, the parties never developed any effective means to communicate about their children, a defect that continues to the present day. Second, the plaintiff never could overcome her distrust of the defendant or her lack of respect for his input regarding parenting decisions, ignoring the consequences this had on the children. Finally, the defendant lacked the attentive and focused parenting skills needed to achieve a successful visiting relationship with the children, failing to understand or accept that such a relationship, even under the best of circumstances, would likely fail to achieve the type of closeness experienced in intact families.

The parties eventually entered into a separation agreement that was approved by the court and incorporated into the judgment of dissolution rendered on May 31, 2005. "That agreement provided, inter alia, that they would share joint physical custody of their children, who would reside with their mother. Despite this purported joint custody label, access by the father to the children was by therapeutic parenting time only . . . [consisting of] five hours each Saturday, three hours each Wednesday, with detailed provision for makeup visits, cancellation and so on.

"The agreement also provided for a complicated and ultimately prohibitively expensive method of supervision and gatekeeping by the children's therapist and a clinical psychologist. There were no detailed provisions for how [the defendant] might establish his ability in the future to have unsupervised visitation with his children. The agreement is silent as to the reasons for such supervision, although it can be inferred by the events which took place in 2004 . . . ." (Footnote omitted; internal quotation marks omitted.) Although the dissolution judgment was modified several times, those provisions governing the legal and physical custody of the children, including that the defendant have only supervised visitation with the children, remained unchanged.

Between 2005 and 2007, some of the defendant's supervised visits with the children were successful and even enjoyable. The defendant, however, was unhappy about the cost of supervised visits and what he viewed as excessive scrutiny as a result of the presence of supervisors. "The reports from this time describe [the defendant] as often unable to respect the children's physical boundaries. He would tickle his son far too long, after being requested to stop. He would tease him in ways that were uncomfortable for the child. His anger at [their periodic] negative reactions to him also frustrated progress in visitation." Although the defendant made attempts to end supervision, those efforts failed. Nevertheless, toward the beginning of 2007, the defendant's counsel at that time recommended the appointment of "a new set of supervisors without the negative connections that the then existing supervisors and gatekeeper had with the family. That recommendation, whether by acceptance or by happenstance, was in fact followed, and a revised order entered by agreement in family court. A new team of supervisors was appointed and the process continued.

"The outcome was, unfortunately, no different . . . [because] the system required by [the plaintiff] in the initial decree was inherently flawed. Because of such continued close observation, [the plaintiff's] obsessive fears about [the defendant], as well as [the defendant's] parenting failures, the very outcome the court orders were designed to prevent came about. That outcome was the slow, but complete erosion of the relationship between [the defendant] and his children. . . .

"There was a gap in contact between [the defendant] and his children during 2007 before a new supervision plan was put into place. When supervised visits were resumed, they were conducted by new therapeutic supervisors . . . . When the supervised visitation concluded in September of 2009, [the primary supervisor] wrote a summary of the supervision. As to [the defendant] and his then [eight year old] twins, she wrote: Jake and Chloe are black and white thinkers, with little room in their ability at this point to think about the duality of situations. . . . Their belief now is [that the defendant] is a liar. It is all about one side or the other, and in this instance it is the negative side. When [the defendant] tries to challenge the children to recall a memory and see it from his perspective, the children feel invalidated and disrespected. . . . Children of this age have a huge sense of what is right and wrong and what is fair and unfair. The only way to handle this situation is to acknowledge the children's point of view. . . . [The defendant], himself being a black and white thinker, has trouble with this concept, and tries to drive the point home, that it didn't happen that way. This only creates power struggles between [the defendant] and the children and does not enhance their relation-

ship." (Internal quotation marks omitted.)

"Of [the plaintiff's] conduct, [the primary supervisor] noted that . . . [the plaintiff] is empathic with the children, and often is in the mode of I know which further reinforces their belief that their father is wrong. The empathy reinforces the polarized differences. That is not [the plaintiff's] intention, I believe, but because she is concerned and aroused emotionally by wanting to attune to her children's needs, this activates the children's fears and therefore their fight/flight mechanisms come into play, which makes them want to avoid these feelings, which they associate with their father." (Emphasis omitted; footnote omitted; internal quotation marks omitted.) The supervisor did not believe, however, that the plaintiff was consciously undermining visitation. The supervisor further maintained that the defendant exhibited great parental ability as long as he was being supervised and the children felt calm.

Nevertheless, "during this period of supervised visitation when her children were between the ages of six and eight years old, [the plaintiff] indirectly sabotaged the visitation. She did this by being overly involved in exchanges and by soothing Jake and Chloe both before and after the visitation. As documented in the visitation notes, she [frequently] scheduled activities and meals shortly after visitation . . . which caused the children's engagement in the sessions to become minimal and resisting. Further . . . it was her custom and habit to keep notes of everything the children said about such sessions. While she claimed she did not let the children know she was keeping these notes, it strains the court's credulity that her heightened and emotional obsessive need 'to protect' her children would not have been apparent to them, through her body language, her tension and her focused interest in what they were saying about their father.

"[The defendant] did not always cover himself in the cloak of good parenting in these visitations, either. . . . As he came under scrutiny, his less helpful traits were called forth and negatively impacted visitation. . . . [V]isitation ended by September, 2009, after two particularly unpleasant events.[4] A different focus and concern on his part could have made a significant difference in his children's perception of them." (Footnote added.)

"[The] visits ended in September, 2009, with no resolution of [the] negative tensions between [the defendant] and his children. . . . [A]t that time, when Chloe and Jake were eight years old, they had emotionally aligned themselves with their mother. [The sometimes] emotionally obtuse conduct [of their father] during visitation supported their negative view of him. The combination of unhelpful conduct [of] both parents meant that their children accepted their mother's anxiety and concerns about visits. They accepted her belief system about their father and his family as their own, and their

stance continues to the present time.

"Wherever the blame for the cessation of visits in 2009 lies, the fact remains that there were no more visits until early spring [of] 2014 . . . when Jake and Chloe were almost thirteen. This is a very significant length of time for children of this age. The memories of their father and their sense of any relationship with him would have eroded just due to that gap in time alone, never mind the other issues between them . . . . Both [the defendant's] parenting deficits, which the children still recall, and the lost window of time during these children's latency years had important and significant consequences for the next and last failed attempt at reunification." (Footnote omitted.)

On January 25, 2013, the court rendered judgment on a stipulated agreement between the parties concerning efforts to reunify the defendant with the children, including the retention of therapists Linda Smith and David Israel for the children. According to the stipulation, "[t]he therapists [were to] direct who meets with them, at what time and with what frequency." The trial court noted that "[t]he agreement was the result of all counsel understanding that it was in the children's best interest[s] to have contact with their father and his extended family.[5] But even this agreement and order was frustrated for over a year by [the plaintiff's] unwillingness to sign the retainer agreement and her detailed concerns. She has admitted that she did not believe the reunification would ever go forward. In a very real sense, although there were subsequently four visits, reunification did not go forward. It ended prematurely and did not accomplish the outcome sought . . . .

"As had happened before, [the plaintiff] encouraged her children to believe that each of them could determine whether or not the visits should continue. Chloe and Jake were demonstrably extremely resistant to visitation with their father. [The plaintiff] continued her resistant and undermining behavior, ongoing at that point for more than ten years . . . . By this time, [the plaintiff] had perfected the art."[6] (Footnote added.)

The four visitation sessions the children had with the defendant were very stressful for them, and they "began to demonstrate and disclose symptoms of their distress to their mother and their therapist. . . . The children's symptoms of distress, in addition to the conduct of their mother, caused the professionals to end the attempt at reunification.

"There was no rapprochement between the children and their father possible at this late date when they were thirteen. [The defendant] and his children have not had any contact since the last of the four visits scheduled with [Smith]." The trial court agreed with and credited the following assessment by the guardian ad litem with respect to the extent of the parental con-

flict at issue in the present case: "The parents have demonstrated a complete lack of insight as to the effects of their inability to communicate after the unfortunate and dramatic history and, if ordered to participate in reunification therapy, the children will have the added emotional distress of the tension involved in bringing these two parents again within the orbit of the other. Neither parent accepts responsibility for the familial circumstances in which the children cope, but instead blame the other in every aspect. . . . Both believe the other had ruined his or her respective life and that of the children."

On April 23, 2014, the defendant filed a motion seeking to open the initial 2005 dissolution judgment to modify the custody and visitation orders in effect. The defendant claimed that the plaintiff was in violation of the January 25, 2013 stipulated judgment and, by way of relief, sought orders (1) requiring the children's removal from the plaintiff's home, (2) continuing the reconciliation therapist's efforts to reunite him with the children, (3) mandating the plaintiff to pay for all ongoing costs related to the children's individual therapy, reconciliation therapy, and the attorney's fees of the defendant. On May 20, 2015, the defendant filed a motion for order that asked the court (1) to order that the January 25, 2013 stipulated agreement regarding reunification remain in effect and be complied with, (2) to issue appropriate orders properly structuring the reconciliation process, and (3) to award the defendant reasonable attorney's fees for bringing and arguing the motion.

The court conducted an evidentiary hearing on the defendant's two postjudgment motions over the course of ten days beginning on January 13, 2016, and ending on February 19, 2016. At the close of the hearings, on February 19, 2016, the defendant filed a statement of proposed orders amending his original claims for relief. As described by the court, the statement set forth three alternative orders in descending order of desirability. The first two options each sought "to require the children to attend the Building Bridges reunification program, either the intensive four day program or the shorter two day Overcoming Barriers program. The third option [was to continue] reunification services with [Smith] and order that the mother undergo therapy to deal with the issues of the minor children and their contact with their father. Other claims for relief [were] for an award of attorney's fees, to compensate [the defendant] for [the plaintiff's] 'alienation' of the children from him, as well as an acknowledgment by the court with an apology that this matter has taken so long to reach a contested hearing." The plaintiff, who represented herself throughout, filed a closing statement that summarized the testimony in her favor and implied that nothing should change regarding custody or visitation because the defendant failed to demonstrate any change in circumstances.

During the trial court proceedings, the court heard recommendations about potential future efforts at family reunification, including from Benjamin D. Garber, an expert witness in psychology and parent/child reunification therapy offered by the defendant. "Garber recommended a program called Building Bridges, for troubled and alienated parent-child relationships. . . . He acknowledged that children involved in this program experience intense pain initially in the process and are under stress. . . . The Building Bridges program would require Jake and Chloe to leave the care of their mother, and attend what is essentially a 'boot camp' for reunification with their father. The intensive program is a four day residential program with [twenty-four] hour therapeutic support, then followed by time alone with their father for a week with continued therapeutic support. Additionally, there is a period of temporary custody of the children to their father for ninety days. The children could also not have any contact with their mother for a specified period of time. The second option is a less intensive [two and one-half] day program, titled Overcoming Barriers, with the same structure and enforced access thereafter. Both programs prohibit contact with the parent who has been determined to be 'alienating' the children from their father."

The court also heard testimony from the children's past and present guardians ad litem regarding the well-being of the children and the effects on them of ongoing reunification efforts. The court summarized as follows: "With the exception of contact with their father, the children have been and are doing extraordinarily well in all other spheres of their lives in the care of their mother. It speaks well of [the plaintiff] and [her current husband] and the home they have been able to create for these children. They are gifted children and excelling academically. They have full social lives and are well respected by their teachers and other students. They are seen as the 'rock stars' of their school class by the school administrators.

"On the negative side, the radioactive fallout from the access disputes between their parents has had an impact. All reports are that they remain anxious about whether they will be forced to spend time with their father by the court or whether, worse yet, custody will be awarded to him. They do not understand why the court does not hear them and accept the validity of their position and emotions about their father."

The present guardian ad litem, Attorney Suzanne Snearly, indicated to the court that the children "believe that their father has not respected them, their physical boundaries and their positions in the past. . . . [They] firmly believe right now that they are a prize to be captured by their [father] at their expense and that of others. They do not want to be treated that way." (Internal quotation marks omitted.) She further indicated that

"[t]o be viewed as a prize is offensive to [the children] . . . and they would be devastated if [the defendant] were to be awarded custody of them. They feel that they have been hostages to this protracted litigation. [Snearly] stated she was sad that they had lost their childhood in that way and lost the ability to have a full relationship with their father. In her opinion, litigation or the Building Bridges program could not create that which had been lost. The children had shared with her that they would be more inclined to reach out to their father if the litigation and forceful efforts to have access would stop. And allowing them to move forward at their own pace is what she recommended, after all these many years of anxiety and protracted litigation. She believed neither the law nor court orders could provide a more reasonable remedy than the parties could fashion on their own in ordering their lives privately." Finally, Snearly testified "that the children did not wish to be forced to have visitation and that, at this point in time, they were prepared to explore the issue voluntarily and send a report of their doings and lives to their father every ninety days. She also felt strongly that their therapy with [Israel] had been enormously beneficial to them and should continue."

On May 16, 2016, the court issued its memorandum of decision denying the defendant's motions. Citing to the guiding criteria set forth in General Statutes § 46b-56, the court reached the following conclusions:[7] "[The defendant's] capacity and disposition to understand and meet the needs of [the children] has been limited. [The plaintiff's] capacity has been limited only on the issues of understanding the importance of knowing their father in the children's optimal development and exposing them to detailed information about the ongoing conflict. In all other areas, she has met their needs very well. The children's past interactions with their father have been largely negative, in their view. Some positive interactions have occurred but not for some considerable time. They have a close relationship with their mother. . . . [Both parties have] been guilty of involving their children in their disputes and litigation. Overall, in considering these factors as to what is in these children's best interests, neither parent fares well on all measures. As found earlier in this decision, neither parent fully appreciates the harm each has done to each other or to their minor children.

"As to [the defendant's] claims, the court begins with the observation that in a civilized society, it should not be the custom or practice to punish youthful victims for the transgression of their elders. [The defendant's] preferred solution would force Chloe and Jake to have contact with him, in a program with therapeutic supports. It appears to be a method for forced reprogramming of the children and their emotional understanding of their family constellation. The emotional coercion of necessity involved in this program would do violence

to these children's emerging sense of self and ability to determine their lives. Ordering their attendance at the program would punish these innocent teenagers for the inability of their parents to become fully functioning and emotionally forgiving adults who could leave their personal war and hatred behind. The court finds that ordering attendance at the Building Bridges program, or the less intensive Overcoming Barriers program, to be a draconian solution in these unusual circumstances. Forced attendance at either program would mete out the blame and punishment [the defendant] wishes to impose on [the plaintiff] on his children. The court declines to take this shortsighted step.

"These children believe that they and their views are not respected by their father or heard by the court. The court does find [that] they have internalized their mother's emotional landscape and negative views of their father and made them their own. Whatever one's view of how their position about their father came about, the court finds that for Jake and Chloe, it has emotional validity and reality, and must be seen in that light. . . .

"The [g]uardian ad litem has suggested and advocated a solution, which would let these . . . teenagers determine the progress of access by themselves. Ordinarily, courts do not empower young people of this age to make adult determinations. But each case is unique, as are these two teenagers. Each of them has been given tacit permission at a younger age to determine the course of their access to their father. Additionally, there have been years of court imposed solutions to the Zilkha/Kaiser family dysfunction supported by well-meaning attorneys and therapists. None of the proposed solutions and earlier court orders has resulted in any meaningful change or increased access.

"There are circumstances where it is the public policy of the state of Connecticut to permit more adult modes of self-determination by young people under the age of eighteen. General Statutes § 45a-724 (a) (1), for example, provides that a child in foster care who can be adopted must consent to that adoption [if the child has attained the age of twelve]. If that consent is not forthcoming, the planned adoption will not proceed. The young person is permitted to have a significant say in [his or] her future, under those circumstances. Additionally, a young person who is sixteen may seek to be recognized as an emancipated minor. General Statutes § 46b-150d permits such a minor, if so emancipated, to live independently and function as a legal adult. Chloe and Jake, fortunately, do not find themselves in either of these statutorily enumerated situations. But their request to be permitted a similar level of mature choice is entitled to be recognized. The court concludes that to do so is in their best interests.

"The court finds that it is past time to seek change

and healing for this group of individuals tied by familial connections. As [Garber] noted in his testimony and the court also finds, there is a limit to what court orders can accomplish to achieve personal change in resistant individuals. The usual court remedies of sanctions, financial orders and the like are not well suited for this herculean task. They would serve only to fuel the ongoing Zilkha family war, as they have for twelve years in the past.

"In this war, this court will seek to impose a cease fire, a cessation of hostilities and some recommendations for how lasting peace and recovery might be achieved. Lasting peace and reconciliation are not outcomes that can be imposed, either on nations or individuals. But if they are sincerely sought and mechanisms [are] put in place for their achievement, they may be secured. It is . . . time to try something new and different.

"First, the court finds that it is in Jake's and Chloe's best interests to permit them to move forward at their own pace to secure a relationship with their father and his extended family. Their position about access to their father has been heard and understood. They should not worry about 'something' until they create that 'something' and give it reality.

"To continue with these thoughts, the 'something' the court now orders is only whatever 'something' they allow it to become. Both Jake and Chloe shall report to their father in detail about their lives every ninety days. They have indicated that they are willing to start with such contact. As that process becomes more comfortable for them, more contact could occur, although it is not ordered. Telephone, e-mail and other contact has never been prohibited in this case, although the parents have considered it to be so. Both children are encouraged to communicate more often in the future than their current stated preference when they are ready to do so. The court encourages them to make it 'something' that begins to approach normal parental access, when they are ready and prepared to do so.

"After they have become comfortable sharing some of their life with their father, they might begin with phone calls, e-mails or text exchanges and then consider meeting face-to-face at a comfortable place of their choosing, such as [a] food court in a mall for a brief snack. Such progression of contact is for them to determine. All these statements are only suggestions by the court, to be shaped by Chloe and Jake and their stated wishes. Both [Israel] and the guardian [ad litem] should assist them in their efforts."

The court then issued the following orders. With respect to future access by the defendant to the children, the court stated that "[s]uch access as may evolve between [the defendant], his extended family and Jake

and Chloe during the less than three years remaining before Jake and Chloe are eighteen shall be voluntary and at Jake and Chloe's choosing and direction. Minimally, it shall be by quarterly written reports provided by the children about their lives to their father. Hopefully, it will progress to more access and, ultimately, personal contact on a regular basis. Should the children wish to progress at some point in the future to normal access, [the plaintiff] must permit alternate weekend overnight access from Friday through Sunday, some hours during the week after school, as well as uninterrupted vacation time in the summer for up to three weeks. All such access is to be unsupervised.

"[The plaintiff] must also permit access by the Zilkha extended family, if Jake and Chloe wish it. That access should begin by sharing information about their lives with their paternal grandmother, much the same way they share information with their father, and perhaps more frequently than every ninety days. The court encourages both of them to communicate with their grandmother, as in the past they had a good relationship with her. Should they wish to do so, they may visit with her and [the plaintiff] is ordered to facilitate such visits.

"The court cautions [the defendant] not to read any legal entitlement to direct access in any fashion to his children through these orders. Visitation is always for the children's benefit. *In this unusual high conflict family and, given Jake and Chloe's age, the court has made it exclusively the minor children's legal entitlement.*" (Emphasis added.)

The court ordered both parties to attend individual therapy with a therapist. With respect to the defendant, the court's order provided that "[h]is therapist should assist him in understanding his children and adolescents in general so that when Jake and Chloe are able to reach out to him, he will be able to respond in thoughtful and emotionally appropriate, as well as considerate, ways. He is to be guided by the affirmative steps his children take and not to prematurely initiate contact on his own. Any such contact as he does have shall be at their request only." As to the plaintiff, the court indicated that "[w]ithin the context of the therapy, it is suggested that the therapist explore the importance of access to both parents for the well-being of children and the consequences of the estrangement and alignment with her own views that [the plaintiff] has imposed upon her children."

The court ordered the children to continue in counseling with Israel "as long as he is willing to provide such assistance and it is therapeutically indicated. If he personally can no longer continue at some point in the future, he shall recommend a replacement therapist for the children. Their mother is ordered to ensure the two children attend such therapy. Additionally, [Israel], consistent with the therapeutic goals for the children,

should endeavor to assist in their voluntary reestablishment of a relationship with their father. To that extent and only if he so requests, the parents and their therapists shall cooperate with any steps he may recommend. Each of the parties shall sign all necessary releases to ensure that all therapists are able to communicate with each other about these steps."

In addition, the court ordered the children's guardian ad litem to disseminate copies of the court's written decision to the parents' individual therapists and to Israel and to ensure that any ordered releases were signed so that the professionals could communicate with each other. The court denied the defendant's request for attorney's fees, indicating that "an order for payment of such fees can only be designed as punishment. The request to use the court system to bludgeon the [plaintiff] is denied with prejudice." The court directed the plaintiff to dismantle her "war room . . . in which her litigation materials are kept and where she works on preparation for the litigation in which she has been involved." (Internal quotation marks omitted.) According to the court, dedicating the space to a "more peaceful use . . . will signal to the children a significant change in their mother's stance toward their father and help them all move forward to secure some peace and healing." The court retained jurisdiction over the matter for a period of one year with respect to issues involving access and visitation "to both streamline further litigation and to ensure enforcement of its orders." Finally, although acknowledging the parties' right to appeal its decision, the court cautioned that "[g]iven their many years of toxic litigation in this family dispute, their collateral civil litigation, as well as appeals already taken, the court directs each of them to carefully consider the negative impact of such conduct on their children. Neither should act in ways to increase their children's anxiety over their future. Such conduct would not be in their children's best interests."

The defendant filed a motion for reargument on June 3, 2016, followed by a supplemental memorandum in support of the motion on June 8, 2016. The court denied the defendant's motion on September 28, 2016. This appeal followed.[8]

I

The defendant first claims that by granting the children a considerable level of control over the extent of the defendant's access to them, the court improperly delegated its judicial function and failed to consider both public policy and the best interests of the children. In support of this claim, the defendant primarily relies upon cases in which our appellate courts have, in different circumstances, found that the trial court completely delegated its decision-making authority to a third party. See *Valante* v. *Valante*, 180 Conn. 528, 532–33, 429 A.2d 964 (1980); *Nashid* v. *Andrawis*, 83 Conn. App. 115,

120, 847 A.2d 1098, cert. denied, 270 Conn. 912, 853 A.2d 528 (2004); *Weinstein* v. *Weinstein,* 18 Conn. App. 622, 628–29, 561 A.2d 443 (1989). We conclude that those cases are readily distinguishable from the court's action in the present case. Furthermore, the defendant has failed to persuade us that, in rendering its decision, the court ignored its obligation to consider the best interests of the children or ran afoul of public policy. Accordingly, we reject the defendant's claim.

We begin with the applicable law governing custody and visitation orders as well as our standard of review. Subsection (a) of § 46b-56 authorizes the Superior Court in any action involving the custody or care of minor children, including a divorce action brought under General Statutes § 46b-45, to "make or modify any proper order regarding the custody, care, education, visitation and support of the children . . . according to its best judgment upon the facts of the case and subject to such conditions and limitations as it deems equitable." Subsection (b) of § 46b-56 provides in relevant part: "In making or modifying any order as provided in subsection (a) of this section, the rights and responsibilities of both parents shall be considered and the court shall enter orders accordingly that serve the best interests of the child and provide the child with the active and consistent involvement of both parents commensurate with their abilities and interests. . . ." Subsection (b) contains a nonexhaustive list of possible orders, ending with a catchall provision permitting "any other custody arrangements as the court may determine to be in the best interests of the child." Subsection (c) of § 46b-56 provides in relevant part that "[i]n making or modifying any order as provided in subsections (a) and (b) of this section, the court shall consider the best interests of the child, and in doing so may consider, but shall not be limited to, one or more of [sixteen enumerated] factors[9] . . . . The court is not required to assign any weight to any of the factors that it considers, but shall articulate the basis for its decision." (Footnote added.) "It is well settled authority that [n]o court in this state can delegate its judicial authority to any person serving the court in a nonjudicial function. The court may seek the advice and heed the recommendation contained in the reports of persons engaged by the court to assist it, but in no event may such a nonjudicial entity bind the judicial authority to enter any order or judgment so advised or recommended." (Internal quotation marks omitted.) *Nashid* v. *Andrawis,* supra, 83 Conn. App. 120.

We utilize an abuse of discretion standard in reviewing orders regarding custody and visitation rights; see *Gallo* v. *Gallo,* 184 Conn. 36, 43, 440 A.2d 782 (1981); *Ridgeway* v. *Ridgeway,* 180 Conn. 533, 541, 429 A.2d 801 (1980); although recognizing that whether the court improperly delegated its judicial authority presents a legal question over which we exercise ple-

nary review. See *Weiss* v. *Weiss*, 297 Conn. 446, 458, 998 A.2d 766 (2010). In exercising its discretion, the court should consider "the rights and wishes of the parents and may hear the recommendations of professionals in the family relations field, but the court must ultimately be controlled by the welfare of the particular child. . . . This involves weighing all the facts and circumstances of the family situation. Each case is unique. The task is sensitive and delicate, and involves the most difficult and agonizing decision that a trial judge must make. . . . The trial court has the great advantage of hearing the witnesses and in observing their demeanor and attitude to aid in judging the credibility of testimony. . . . Great weight is given to the conclusions of the trial court which had the opportunity to observe directly the parties and the witnesses. . . . A conclusion of the trial court must be allowed to stand if it is reasonably supported by the relevant subordinate facts found and does not violate law, logic or reason. . . . [T]he authority to exercise the judicial discretion under the circumstances revealed by the finding is not conferred upon this court, but upon the trial court, and . . . we are not privileged to usurp that authority or to substitute ourselves for the trial court. . . . A mere difference of opinion or judgment cannot justify our intervention. Nothing short of a conviction that the action of the trial court is one which discloses a clear abuse of discretion can warrant our interference." (Citations omitted; internal quotation marks omitted.) *Gallo* v. *Gallo*, supra, 43–45.

The defendant's claim that the court in the present case abandoned its obligation to decide the matter before it and improperly delegated its statutory authority regarding custody and visitation simply is not borne out by the careful and exhaustive decision issued by the trial court. The court did not ask any other person to decide whether the defendant should have any right to custody or visitation. The court fully weighed the facts presented and the competing interests of all the parties, set forth the proper legal framework, including citing § 46b-56, and rendered a decision on the merits, articulating in detail the basis for its decision denying the defendant's motions.

Because the court properly exercised its decision-making authority, we summarily reject the defendant's reliance upon cases in which this court or our Supreme Court have reversed a family court's order on the ground that the court had improperly delegated a core decision-making function to a party not "clothed with judicial authority." *Valante* v. *Valante*, supra, 180 Conn. 532–33; see also *Nashid* v. *Andrawis*, supra, 83 Conn. App. 120–21; *Weinstein* v. *Weinstein*, supra, 18 Conn. App. 628–29. The present case is wholly inapposite to those cited by the defendant. In each of the cases cited by the defendant, the court removed itself entirely from the decision-making process by permitting legal issues

to be resolved through binding arbitration that was subject to limited judicial review; see *Nashid* v. *Andrawis*, supra, 120–21; or by delegating the court's authority and obligation to render a binding decision to a family relations officer; see *Valante* v. *Valante*, supra, 532–33; or to a guardian ad litem. See *Weinstein* v. *Weinstein*, supra, 628–29. Unlike in those cases, the court in the present case properly considered and fully resolved the custody and visitation issues before it by rendering a decision on the defendant's motions and the relief requested therein.

Simply put, rather than delegating its responsibility, the court exercised its authority and met its obligation to decide issues of custody and visitation by denying the defendant's motions. This adjudication by the court was the antithesis of a delegation because it plainly decided that the defendant should not have any *right* to custody or visitation. The fact that the court's order left open the possibility of voluntary visits at the discretion of the teenagers does not transform the court's decision-making into impermissible delegation.

The court went to great lengths to consider the potential benefits the children might gain from independently reestablishing some relationship with the defendant while recognizing that ordering visitation, at this late stage, in light of the children's deeply ingrained attitudes, was unlikely to magically heal their fractured relationship with the defendant. The court gave apt consideration to the children's desires to have some control over their lives and the people with whom they interact. It was entirely appropriate, for the reasons stated by the court, for it to have considered that the children were teenagers and to give considerable weight to their opinions and desires to control their own destinies.

Ultimately, it was the court's judicial determination that the best interests of the children required that the defendant's physical access to them be voluntary in nature, at the choosing and direction of the children. Such a decision avoided the setting of an arbitrary and inflexible visitation schedule or reunification regime, which the family's history suggests would very likely lead to further conflicts, and, instead, encouraged and facilitated a voluntary path to reunification while at all times making clear that the defendant had no legal rights in this regard.

Finally, the court correctly, and on numerous occasions throughout its decision, acknowledged and gave due consideration to its duty to craft orders that took into consideration both the best interests of these particular children and the well established public policy that children of divorce are usually best served by maintaining a meaningful relationship with their noncustodial parent. In the present case, in which those considerations often suggested divergent paths, the

court did an admirable job in taking a balanced approach. The court recognized that the children would benefit from a relationship with the defendant and squarely placed much of the blame for a lack of such a relationship at the feet of the plaintiff. Nevertheless, the court could not ignore the defendant's own poor behavior or the detrimental effect that would result from removing the children from the plaintiff and forcing them into one of the requested programs.

In sum, the defendant has failed to demonstrate that the court improperly delegated its judicial function. He also has failed to show that the court abused its discretion by failing to consider the best interests of the children or any established public policy. The defendant's claim, accordingly, fails.

II

The defendant next claims that the court improperly relied upon events that occurred between 2004 and 2007 in reaching its decision to deny his motions, disregarding what he characterizes as an indication to the parties during the evidentiary hearing that such evidence was too remote and insufficiently weighty for proper consideration by the court. We are not persuaded.

In support of this claim, the defendant focuses our attention to an instance during the presentation of evidence in which the court attempted to encourage the parties not to focus upon minute details of long past events but upon the presentation of the evidence most likely to be germane to the important decision facing the court. Specifically, at one point in the proceeding, the self-represented plaintiff, who is not an attorney, was cross-examining the defendant about details of his 2004 assault of her, attempting to demonstrate that he had made false statements about the cause of her injuries, something he had admitted during direct examination. When the cross-examination began to falter following an objection regarding the admission of details of a Department of Children and Families report, the following colloquy occurred:

"The Court: Let me say this. I recognize and do not mean to make any statements about how important this event has been in your dissolution proceedings and in the various claims about visitation and access. But it is now eleven years ago.

"So for purposes of this hearing about what's to happen next, it has become remote in time. Yes, it informs your consequential actions from it. But the details of what was said to whom in 2004 and the accuracy of those statements today is perhaps not as weighty as you might feel them to be.

"[The Plaintiff]: My—thank you, Your Honor. My reasoning is to bring up the veracity of [the defendant] in situations.

"The Court: I hear you, but he has admitted that he made false statements already.

"[The Plaintiff]: Okay. Thank you, Your Honor.

"The Court: That this was not true.

"[The Plaintiff]: Thank you, Your Honor. I will move on."

The defendant also directs our attention to an exchange that occurred during a discussion regarding scheduling, in particular, the plaintiff's list of witnesses she potentially might call for the purpose of authenticating documents. After agreeing to withdraw a number of the witnesses, the following colloquy occurred:

"[The Defendant's Counsel]: Okay. I don't object to Mr. Magnano as a witness, even though I think—

"[The Plaintiff]: I will withdraw him at this point. I think Your Honor [has] made it abundantly clear that you would like the further—

"The Court: I'm more interested in the more recent than—I don't mind having a summary of the past events—

"[The Plaintiff]: A mosaic?

"The Court: —but I don't know that it's necessary to prove each and every one of them now."

Having thoroughly reviewed the record, we conclude that the defendant misconstrues the nature and import of the preceding colloquies. As previously observed, in matters involving custody and visitation, the court properly exercises its discretion by "weighing all the facts and circumstances of the family situation." *Gallo* v. *Gallo*, supra, 184 Conn. 44. The court did so in the present case. We are not aware of any point during the proceedings in which the court indicated that it would not consider or rely upon evidence occurring in or before 2007, as the defendant suggests, or that the court otherwise precluded or limited the scope of the parties' presentation of evidence.

Instead, the court was simply trying to encourage the parties to focus on the most relevant facts relating to the current feelings and conduct of the parties. In doing so, the court never indicated that the historical facts were irrelevant or that the parties were precluded entirely from offering evidence regarding them.

The trial court is responsible for the orderly and efficient management of its docket. See *Sowell* v. *DiCara*, 161 Conn. App. 102, 132, 127 A.3d 356 ("[m]atters involving judicial economy, docket management [and control of] courtroom proceedings . . . are particularly within the province of a trial court" [internal quotation marks omitted]), cert. denied, 320 Conn. 909, 128 A.3d 953 (2015). Accordingly, it is not improper or surprising that some guidance from the court was

necessary and appropriate to maintain an orderly and timely presentation of the evidence in the present case.

We conclude that the court properly admitted and considered all relevant evidence presented in reaching its decision. The defendant has failed to demonstrate that the court abused its discretion in this regard and, accordingly, we reject his claim.

III

The defendant also claims that the court improperly considered and adopted the recommendations made by Snearly, the children's guardian ad litem, because, according to the defendant, she "chose to function as an attorney for the minor children instead of fulfilling her obligations as [a] guardian ad litem." The record does not support this claim.

We agree with the defendant that the role and function of a guardian ad litem for a minor child is distinct from that of an attorney for a minor child. "Typically, the child's attorney is an advocate for the child, while the guardian ad litem is the representative of the child's best interests." (Internal quotation marks omitted.) *Ireland* v. *Ireland*, 246 Conn. 413, 439, 717 A.2d 676 (1998). It is axiomatic, however, that, in making a final decision regarding custody and visitation, "[a] court is permitted to seek advice, and accept recommendations, from the guardian ad litem." *Keenan* v. *Casillo*, 149 Conn. App. 642, 661, 89 A.3d 912, cert. denied, 312 Conn. 910, 93 A.3d 594 (2014).

The defendant has not directed our attention to any factual findings of the court or other evidence in the record before us that would support his assertion that Snearly blindly advocated for the children rather than exercised her own discretion in making the recommendations that she did. The mere fact that her recommendations that the defendant's motions be denied aligned with the wishes of the children does not support a conclusion that Snearly abandoned her role as a guardian ad litem for the children to don the mantle of their legal advocate or that her recommendations could not properly be considered by the court.

Furthermore, there is nothing to support the assertion that the court simply adopted Snearly's recommendations in the present case. Snearly testified during the hearing, detailing her investigation and interactions with the children. She also made recommendations, both orally and in writing, about what, in her opinion, would be in the children's best interests with respect to visitations with the defendant and further reunification efforts. Specifically, Snearly testified that the children did not want to be forced by the court to have visitations with the defendant and that they would be emotionally devastated if that happened. She indicated that any attempt at forced reunification would be intensely upsetting for the children. She indicated that forced

participation in the Family Bridges reunification program would "turn their entire lives completely upside down at a very detrimental point in their life and development."

Unquestionably, the court considered Snearly's opinion as a guardian ad litem as part of its consideration of the record as a whole. The court never indicated at any point, however, that it was simply adopting Snearly's recommendations wholesale. In fact, the court stated: "The [guardian ad litem's] recommendation demonstrates her compassion for her wards and the pain they have suffered. It also *assists* the court in considering the parties' claims for relief and what remedy, if any, is available for this group of adults and two children who stand in the middle of their protracted conflict." (Emphasis added.) We construe this as an indication by the court that Snearly's recommendation assisted the court in its own independent calculus of what relief would be in the best interests of the children. We thus reject as factually unsupported the notion that the court adopted Snearly's recommendations.

Finally, Snearly's testimony and opinion were subject to cross-examination by the defendant's counsel, who was free to explore the defendant's allegations of bias and failure to adhere to her obligations as a guardian ad litem. Moreover, in addition to Snearly's recommendations, the court also carefully considered and discussed in its decision other contrasting viewpoints, including those from Garber, who recommended and advocated for the Building Bridges program favored by the defendant. Ultimately, our review of the record demonstrates that the court reached its own independent decision regarding what would be in the best interests of the teenaged children moving forward, and did not simply adopt the recommendation of Snearly as suggested by the defendant. Accordingly, we reject the claim and its underlying premise. To the extent that the defendant truly believes that Snearly failed to exercise her obligations as a guardian ad litem properly, other avenues were available for addressing those concerns, such as seeking her removal and replacement. Such allegations simply do not form a basis for reversing the decision of the trial court in the present case.

IV

Finally, the defendant claims that, in reaching its decision, the court improperly relied on an erroneous factual finding, namely, that the parties' reconciliation therapist, Smith, had ended reconciliation therapy with the parties. The defendant argues that the finding is not supported by the record and is in direct contradiction to Smith's own testimony. He also argues that the alleged error was "so material to the heart of the matter at issue as to have changed the outcome of the trial." We again find the defendant's claim wholly unpersuasive.

As previously stated, in reviewing a court's decision in family matters, this court defers to the facts as found by the trial court unless those findings are clearly erroneous. "A finding of fact is clearly erroneous when there is no evidence in the record to support it . . . or when although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed." (Internal quotation marks omitted.) *Adams* v. *Adams*, 93 Conn. App. 423, 427, 890 A.2d 575 (2006). "Where, however, some of the facts found [by the court] are clearly erroneous and others are supported by the evidence, we must examine the clearly erroneous findings to see whether they were harmless, not only in isolation, but also taken as a whole. . . . If, when taken as a whole, they undermine appellate confidence in the court's fact finding process, a new hearing is required." (Internal quotation marks omitted.) *Lambert* v. *Donahue*, 78 Conn. App. 493, 507, 827 A.2d 729 (2003).

The defendant directs our attention to certain passages in the trial court's decision in which the court discusses the agreement the parties reached in 2013 to enter into reunification therapy with Smith. The court indicated that the parties had only four sessions, they were very stressful for the children, and "[t]he children's symptoms of distress, in addition to the conduct of the mother, caused the professionals to end the attempt at reunification. There was no rapprochement between the children and their father possible at this late date when they were thirteen." The gravamen of these findings, when read in context, is that the parties had been unable to benefit in any meaningful way from their reunification therapy sessions.

The defendant argues that it was a misrepresentation for the court to have stated that the professionals ended the therapy, pointing to testimony by Smith in which she stated that, in her opinion, she did not believe the parties had "reached an end" therapeutically and that the parties may have benefitted from different treatment approaches. In the same testimony, however, Smith also acknowledged that she did not "know what happened because at that point [it] ended, but it just didn't go forward after that." Whether therapy was in fact ended by the professionals or whether the parties simply stopped attending on their own, there is nothing in the court's analysis that suggests that this was an important or material factor in its decision to deny the motions of the defendant. It was the failure of the therapy to alter the destructive behaviors of the parties that led the court to its conclusion that more of the same was unlikely to be in the best interests of the children. Accordingly, even if we were to agree that the court's finding that Smith ended reunification therapy was a factual error, when the court's remaining unchallenged findings are considered as a whole rather than

focusing on that one alleged inaccuracy, there is ample support in the record for the relief ordered by the court. This includes its decision regarding the defendant's future access to his teenaged children, with whom he has never developed any meaningful relationship. Because the claimed error does not undermine our confidence in the court's overall fact-finding process, we conclude that any error was harmless.

The judgment is affirmed.

In this opinion the other judges concurred.

[1] Karen Zilkha is now known as Karen Kaiser. Although the trial court altered the case caption of its memorandum of decision to reflect that name change, we caption our opinion to reflect the names of the parties as they appeared in the original pleadings.

[2] The first incident involving the police happened on June 17, 2004, when, during a heated dispute, the plaintiff decided she was going to a motel and taking the children. The defendant grabbed his daughter Chloe and would not release her despite her screams for the plaintiff. The responding officer advised the defendant that he would be arrested unless he released the child, which he eventually did. As described by the court in its memorandum of decision, "[t]he third incident occurred during supervised visitation on October 30, 2004. The police were called by the visitation supervisor, who witnessed [the defendant] being verbally very aggressive toward [the plaintiff] in front of the children. The supervisor terminated the visit because he was afraid [the plaintiff] would be assaulted by [the defendant]." (Footnote omitted.)

[3] With respect to the defendant, Adamakos' report provided as follows: "Undoubtedly, [the defendant's] demeanor and behavioral presentation improves when he is feeling less defensive, and may indicate the presence of some psychological strengths which are now under assault by the very high level of stress he is experiencing (regardless of whether it is caused by himself or by the situation). There was some indication that [the defendant's] response can be somewhat histrionic, and that in this regard, he can be impulsive and evidence impaired judgment. There was also some sense that he maintains an attitude of narcissism and a sense of entitlement [that] may contribute to his occasionally violating the expectations of others. However, there was lacking indication that he was malicious in his intent. There is no dispute that he was engaged in severe verbal disputes (tirade at Borders 10/30/2004), some level of physicality (pushing [the plaintiff] 6/30/2004) and desperate dramatic acts (holding Chloe so that [the plaintiff] could not leave with her 6/17/2004). He seems to be a person who tends to manage his stress by finding outlets of escape or recreation. He engages in denial and repressive defense mechanisms excessively." With respect to the plaintiff, Adamakos made the following observations: "[The plaintiff] is a woman who appears to have a fairly traditional sense of mores and expectations. Her aspirations have been modest and continued to be centered around parenting the children. She appears to have needed some assistance in the transitions in her life, and she sometimes had some difficulties adjusting to trying circumstances. It would seem as though she may struggle with some anxiety and dependency related issues, but largely she has compensated for them over the years. Extreme stress threatens to escalate these needs, but there is no indication of significant psychopathology for her either, and in a very straightforward manner, psychological testing supported the impression that she is functioning normally."

As indicated by the court in its memorandum of decision, Adamakos' observations were consistent with the court's own contemporaneous observations of the parties during the underlying courtroom proceedings.

[4] The first event occurred in July, 2009, when the children were performing in a play and asked the defendant not to attend. Because the plaintiff also did not want him to attend, the supervisor's company would not supervise that contact. Nevertheless, the defendant attended the performance, and his attendance was videotaped by the plaintiff's spouse, Glen Kaiser. When asked, the plaintiff told the children that the defendant had attended. As the trial court found, "[n]either parent earn[ed] any glory for their conduct. . . . [The defendant] should have respected his children's wishes and used the next visitation session to ask his children to tell him about the play, which undoubtedly they would have enjoyed. His conduct, if [the plaintiff's]

resistance to his access to the children is at least a partially conscious strategy, played right into her hands by his failure to honor the children's wishes.

"The [plaintiff's and Glen Kaiser's] reaction was also not appropriate and calls into question just how innocent [the plaintiff's] intentions in her 'empathy' with her children have been. The visitation supervisor was focused only on [the defendant's] less than exemplary conduct. She constructed, together with [the defendant], a script for a sincere apology which he did not follow. The self-indulgent excuses he made upset the children and the visits deteriorated from then on. Likely, as [Adamakos] noted in 2005, more than four years earlier, [the defendant's] 'denial and excessive defense mechanisms' did not help him in this task.

"Some three or four weeks later, there was a visit scheduled between [the defendant], his mother and the children's step-grandfather. By way of background, [the defendant] comes from a prominent extended family, with members that reside in England and Europe. When they were young, Jake and Chloe enjoyed a good relationship with their paternal grandmother, [Jillian] Ritblat, and other members of the family. Over time, [the plaintiff] put the brakes on these connections and did not support them. [Jillian] Ritblat testified as to how attenuated their connections had become during the 2007–2009 supervised visitation period. The children, in 2009, were extremely resistant to visitation and acted in a manner that can only be described as contemptuous and extremely rude toward their grandmother and grandfather. In an ordinary family situation or even visitation situation, they would have been sanctioned for such conduct. In this instance, however, therapeutic supervision meant that they were rewarded by the intervention of the supervisor when the grandparents reacted with some hostility to the lack of respect shown to them.

"There is no doubt the entire situation could have been handled by the adults with more compassion. But these children were then just eight years old. That the children's standoffish, resistant, and at times rude conduct would not have been acceptable pursuant to the cultural norms of the grandparents was not considered by anyone. The visit ended prematurely with many recriminations. Jake and Chloe have not seen their grandmother since that time, a period of seven years."

[5] The stipulation provided in relevant part: "The mother will support the father/child relationship by saying to the children that she and the father have agreed to stop arguing in court; that she wants them to have a loving and caring relationship with their father, and that she will support them in their efforts to rebuild that relationship, because he is their father and because he cares about them, loves them, and has much to offer them. [The children's attorney and their guardian ad litem] will be present when the mother has this conversation with the children. Both parents will respect the desires of the children, except they jointly expect the children to engage and cooperate with their goal to reunite them with their father."

[6] "On March 9, 2014, Smith wrote an e-mail to the guardian ad litem and the children's therapist outlining [the plaintiff's] resistant actions. [Smith] stated that: I have offered to try to make this as easy and least disruptive [as possible] for the children. For example, not taking them out of school. [The plaintiff] then chooses to take them out of school, and the children then blame [the defendant] for missed school. They blame [the defendant] for having to hide in their rooms when the process services came. But who didn't open the door? They blame [the defendant] for the court dates over the last year and all the money that has been spent. But who didn't sign the contract and resisted starting the reunification? They vilify every professional who has not aligned with their viewpoint of no contact ([the] children and [the] mother). They are looking to make [the defendant] appear bad that he may be bipolar or [manic]. Yesterday they locked themselves in their room. A typical parent response would have been to open the door. Locked doors can be opened, both with tools and/or taking doors off the hinges. . . . [T]hey didn't do that. Why not? A clear message was sent to the children. Yesterday, Chloe had a concert that was supposed to be taken away. It wasn't. . . . [The defendant] predicted that the children would go to the concert last night. . . . He also predicted that the children would blame him for missing school (after [the plaintiff] chose missing school instead of a late afternoon [appointment]). . . . I really hope that a fuller picture of the family dynamics are becoming clear to everyone. There are many issues to address here. It is not just the children and [the defendant]. This is systemic and needs a unified systemic approach. Otherwise the same pattern will happen as from the past."

[7] The court earlier in its decision had reached the following conclusion based upon its review of the exhibits and testimony presented by the parties: "[T]he truth of each of these parents' assertions against the other lies somewhere between the extremes they present. The plaintiff cannot acknowledge or recognize the manner in which her excessive anxiety and compulsive fears about [the defendant] have impacted her children and their reaction to their father. Conversely, the defendant only now appears to recognize how [the plaintiff's] conduct and the children's mirroring actions triggered his overblown and faulty parenting reactions. The parties' testimony and demeanor in court amply demonstrated their ability and willingness to continue their negative and toxic interactions.

"[Although] greater fault in bringing about the complete failure of access between the children and their father can perhaps be assigned to the [plaintiff], neither of these parents is blameless. For [the children], the amount of blame to be assigned [to] each of their parents has little meaning. Both have lost sight of the children's need to have the unhampered love and affection of both parents. Their war over their children brings the biblical example of King Solomon's ruling vividly to mind. Unfortunately, the biblical sword has already fallen on Jake and Chloe."

[8] The plaintiff never filed an appellee's brief in this matter. On April 13, 2017, this court issued an order indicating that the appeal would be heard solely on the basis of the appellant's brief, appendices and record as defined by Practice Book § 60-4. Thereafter, the guardian ad litem filed a brief in opposition to the defendant's appeal. See Practice Book § 67-13.

[9] The statutory factors are as follows: "(1) The temperament and developmental needs of the child; (2) the capacity and the disposition of the parents to understand and meet the needs of the child; (3) any relevant and material information obtained from the child, including the informed preferences of the child; (4) the wishes of the child's parents as to custody; (5) the past and current interaction and relationship of the child with each parent, the child's siblings and any other person who may significantly affect the best interests of the child; (6) the willingness and ability of each parent to facilitate and encourage such continuing parent-child relationship between the child and the other parent as is appropriate, including compliance with any court orders; (7) any manipulation by or coercive behavior of the parents in an effort to involve the child in the parents' dispute; (8) the ability of each parent to be actively involved in the life of the child; (9) the child's adjustment to his or her home, school and community environments; (10) the length of time that the child has lived in a stable and satisfactory environment and the desirability of maintaining continuity in such environment, provided the court may consider favorably a parent who voluntarily leaves the child's family home pendente lite in order to alleviate stress in the household; (11) the stability of the child's existing or proposed residences, or both; (12) the mental and physical health of all individuals involved, except that a disability of a proposed custodial parent or other party, in and of itself, shall not be determinative of custody unless the proposed custodial arrangement is not in the best interests of the child; (13) the child's cultural background; (14) the effect on the child of the actions of an abuser, if any domestic violence has occurred between the parents or between a parent and another individual or the child; (15) whether the child or a sibling of the child has been abused or neglected, as defined respectively in section 46b-120; and (16) whether the party satisfactorily completed participation in a parenting education program established pursuant to section 46b-69b." General Statutes § 46b-56 (c).